UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

UNITED STATES OF AMERICA

v.                                                                                  Case No:  2:14-cr-2-FtM-38DNF

JONATHAN ROBERT MAUSE

### REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

**I.     Introduction**

This cause is before the Court on Defendant Jonathan Robert Mause's ("Defendant") Motion to Suppress Statements (Doc. 49) filed on April 30, 2014.  The United States of America (the "Government") filed a Response to Defendant's Motion to Suppress Statements (Doc. 55) on May 14, 2014.  This matter was referred to the Court for a report and recommendation and an evidentiary hearing was held on June 11, 2014.  At the hearing, the Court granted Defendant ten days to file a supplemental brief in support of his Motion to Suppress Statements and allowed the Government leave to file a response to Defendant's supplemental brief.  On June 20, 2014, Defendant filed his Supplement to the Motion to Suppress Statements (Doc. 74), and the Government filed a Response to Defendant's Supplement (Doc. 81) on June 25, 2014.  Defendant filed a Reply to the United States' Response to Defendant's Supplement to the Motion to Suppress on July 9, 2014.  Defendant is charged with Falsification of Records in a Federal Investigation, in violation of 18 U.S.C. § 1519(a); Perjury to a Grand Jury, in violation of 18 U.S.C. § 1623(a); and False Statements to a Federal Investigator, in violation of 18 U.S.C. 1001.  (Doc. 23).  For the reasons explained below, the Court respectfully recommends that Defendant's Motion to Suppress Statements be **DENIED**.

## II. Evidence Presented at Hearing

The Government presented the testimony of three witness: Sergeant Michael Snow and Lieutenant Kim Sandoval of the DeSoto County Sheriff's Office, and Agent James Roncinske of the Federal Bureau of Investigations. The Government introduced nine exhibits into evidence: Exhibit 1, a compact disc containing a recording of the June 6, 2013 interview of Defendant; Exhibit 2, a transcript of the June 6, 2013 interview of Defendant; Exhibit 3, an e-mail from Defendant to Lt. Sandoval dated June 6, 2013; Exhibit 4, a transcript of testimony given by Defendant to the grand jury on August 8, 2013; Exhibit 5, an e-mail from Defendant to Lt. Sandoval dated August 11, 2013; Exhibit 6, a compact disc containing a recording of the October 17, 2013 interview of Defendant; Exhibit 7, a transcript of the October 17, 2013 interview of Defendant; Exhibit 8, a compact disc containing a recording of the October 21, 2013 interview of Defendant; and Exhibit 9, a transcript of the October 21, 2013 interview of Defendant.

### A. Testimony of Sergeant Michael Snow

Sgt. Snow testified that he is employed as a sergeant in the school resource division of the DeSoto County Sheriff's Office. (Tr.[1] 5). Prior to his current position he served as a detective for approximately six years in the criminal investigations division. (Tr. 6).

On June 4, 2013, Sgt. Snow was directed by Lt. Sandoval to initiate a criminal investigation into an allegation by an inmate, Jody Wayne Holland, that he had been abused by a corrections officer at the DeSoto County Jail on May 25, 2013. (Tr. 6). The target of the investigation was Corporal Steven Rizza, a correctional officer of the DeSoto County Sherriff's Office. (Tr. 7). In connection with this investigation, Sgt. Snow began conducting interviews of

---

[1] Tr. refers to the Transcript of Motion to Suppress (Doc. 101) filed on July 15, 2014.

the target and potential witnesses. (Tr. 7). Sgt. Snow testified that it is common practice to conduct such interviews at witnesses' homes or their place of work. (Tr. 7). Sgt. Snow explained that two officers typically conduct the interview and the interviews are sometimes recorded. (Tr. 8).

On June 6, 2013, at approximately 2:00 p.m., Sgt. Snow participated in an interview of Defendant. (Tr. 8). Lt. Sandoval was also present. (Tr. 8-9). The interview was conducted at Defendant's residence and was recorded without Defendant's knowledge. (Tr. 9). Sgt. Snow did not participate in any subsequent interviews of Defendant. (Tr. 9). Sgt. Snow was promoted shortly after the interview and left the criminal investigations division. (Tr. 9-10).

On cross examination, Sgt. Snow testified that he recorded the interview of Defendant because it is common practice to record interviews. (Tr. 13). Sgt. Snow testified that he believed that Defendant did not know that he was being recorded. (Tr. 13). Sgt. Snow testified that before surreptitiously recording the interview with Defendant, he had already conducted two other interviews with Corporal Steven Rizza and Corporal Carlucci, which were also surreptitiously recorded. (Tr. 14).

Sgt. Snow testified that he was not aware that Corporal Rizza and Defendant were friends at the time he interviewed Defendant. (Tr. 15). Sgt. Snow testified that at no time during the interview did he or Lt. Sandoval read *Miranda* rights to Defendant. (Tr. 16). Sgt. Snow testified that he did not tell Defendant that any statements he made could be used against him either administratively or criminally. (Tr. 16).

Sgt. Snow testified that the time of the interview he knew that Defendant was not physically present when the event occurred with Jody Holland at the DeSoto County Jail. (Tr.

16). Sgt. Snow testified that he interviewed Defendant because he had worked the shift immediately after the shift in which the incident occurred. (Tr. 16).

Sgt. Snow testified that when he met with Defendant, he explained that he was investigating an ongoing criminal investigation. (Tr. 19). At no time during the interview did Sgt. Snow or Lt. Sandoval tell Defendant that he did not have to speak to them. (Tr. 20). Sgt. Snow testified that the interview occurred outside Defendant's residence, not inside. (Tr. 21).

### B. Testimony of Lieutenant Kim Sandoval

Lt. Sandoval testified that she is a deputy sheriff with the DeSoto County Sheriff's Office. (Tr. 23). She has been employed with DeSoto County for twenty years. (Tr. 23). Before serving with the DeSoto County Sheriff's Office, Lt. Sandoval worked as a military police officer and investigator for six years, and worked for the Charlotte County Sheriff's Office for a little under a year. (Tr. 23). Lt. Sandoval is the supervisor of the investigative division at the DeSoto County Sheriff's Office. (Tr. 23). As supervisor of the investigative division she is in charge of the criminal investigative division, narcotics unit, and crime scene unit. (Tr. 23-24).

On June 4, 2013, Lt. Sandoval was assigned a criminal investigation into an allegation that a correctional deputy had battered an inmate at the DeSoto County Jail. (Tr. 24). The focus of the investigation was on Corporal Steven Rizza. (Tr. 24). In furtherance of this investigation, Lt. Sandoval assigned Det. Snow and Corporal Reyea to respond to the Hardy County Jail to interview Jody Holland. (Tr. 25). Lt. Sandoval did not participate in this interview. (Tr. 25).

On June 6, 2013, Lt. Sandoval interviewed Deputy Ashley Cross, Deputy Rizza, and Defendant. (Tr. 25). For the most part these interviews were conducted at the deputies' homes. (Tr. 25). The interview of Defendant occurred outside the front door of his residence, specifically under a stairwell to an upstairs apartment. (Tr. 26). Lt. Sandoval testified that the interview

occurred there because Defendant came outside of his residence and elected to have the interview outside. (Tr. 26). Lt. Sandoval testified that Defendant never indicated that he wanted to go back into his home and end his contact with her. (Tr. 26). Lt. Sandoval told Defendant that she was questioning him in connection with a criminal investigation into Jody Holland's accusation that Corporal Rizza had battered him while he was in jail. (Tr. 27).

Lt. Sandoval testified that she explained to Defendant that she was performing a criminal investigation because Defendant worked at the DeSoto County Sheriff's Office and she wanted him to understand that she was not conducting an internal investigation. (Tr. 27). Lt. Sandoval testified that if she was investigating an internal investigation, Defendant would have been compelled to give testimony. (Tr. 27).

Lt. Sandoval testified that she believed that Defendant was merely a possible witness on during the June 6, 2013 interview. (Tr. 29). Lt. Sandoval believed he was a witness because Defendant was on the shift directly after the incident. (Tr. 29). The incident occurred on May 25, 2013, at approximately midday. (Tr. 29). Defendant came on duty at 6:00 p.m for a twelve hour shift. (Tr. 29). Jody Holland was still present at the DeSoto County Jail when Defendant came on shift. (Tr. 29). During the interview, Lt. Sandoval asked Defendant what he knew about the incident. (Tr. 30). At the conclusion of the interview, the status of Defendant had not changed. (Tr. 30). At the time of the June 6, 2013 interview, Lt. Sandoval did not have any telephone records and was unaware of any contact between Defendant and Corporal Rizza. (Tr. 30). At the time of the June 6 interview, Lt. Sandoval had a copy of a written incident report, that she believed was drafted by Corporal Rizza. (Tr. 30-31).

Approximately ten minutes after Lt. Sandoval left Defendant's house on June 6, 2013, interview, Defendant sent Lt. Sandoval an email. (Tr. 32). The first half of the email was an

explanation of some things that Defendant recalled after the interview about his activities during his shift the night of the incident. (Tr. 32-33). The second half of the email was a forwarded copy of an email from May 25, 2013, the day of the incident, which Defendant had sent to Captain Kruger at the jail and his supervisor Lt. Harris on the night of the incident. (Tr. 33). Lt. Sandoval never asked Defendant to send this information. (Tr. 33-34).

After the June 6, 2013 interview, the Federal Bureau of Investigation joined the criminal investigation. (Tr. 31). The FBI's investigation was led by Agent James Roncinske. (Tr. 31). Defendant gave testimony before a grand jury on August 8, 2013. On August 11, 2013, Defendant sent Lt. Sandoval an email concerning his grand jury testimony. (Tr. 34). The email indicated that Defendant wished to speak with Lt. Sandoval when she was available. (Tr. 35). On August 12, 2013, Defendant travelled to Lt. Sandoval's office. (Tr. 35). Defendant indicated that he was concerned about his grand jury testimony and questions that he had been asked, specifically questions about his previous employment at Charlotte County Correctional Institute and questions about his phone records. (Tr. 36). Defendant indicated that he had obtained his phone records after the grand jury testimony, and had reviewed them. (Tr. 36). Lt. Sandoval told him that she was aware of the phone records being obtained and that she knew that some of them had been very length conversations in the days following the incident. (Tr. 36). Defendant stated that he had spoken with Corporal Rizza at length about training issues in the jail. (Tr. 37). Lt. Sandoval testified that she had no reason to question Defendant's representations about the contents of phone conversations between Corporal Rizza and Defendant. (Tr. 37). Based on what Defendant told Lt. Sandoval about the communications, Defendant's status in the investigation did not change. (Tr. 37). The meeting lasted approximately five to ten minutes. (Tr. 37).

On October 16, 2013, Agent Roncinske asked Lt. Sandoval to get with a computer technician and see if there was any way to determine if there was an audit trail or history recorded in the computer systems that would reveal whether the incident report had been altered in any way. (Tr. 38). At the time, Lt. Sandoval had no idea why Agent Roncinske was requesting such information or even that the requested information was even obtainable. (Tr. 38-39). Lt. Sandoval met with a technician and obtained the information, which showed that the incident report had been modified nineteen times. (Tr. 39). Lt. Sandoval learned that the person who was logged in at the time the modifications were made was Defendant. (Tr. 39). Lt. Sandoval testified that she did not know of the modifications before October 17, 2013. (Tr. 39). After finding out this information, Lt. Sandoval decided to interview Defendant again to get an explanation for the modifications. (Tr. 39-40). Lt. Sandoval characterized these modifications as significant. (Tr. 40).

On October 17, 2013, Lt. Sandoval conducted another interview with Defendant at his residence. (Tr. 40). The interview took place outside Defendant's front door and was surreptitiously recorded. (Tr. 40-41). During the interview Defendant indicated that he understood he could terminate the interview. (Tr. 42). Defendant went inside his home twice during the interview, but returned each time. (Tr. 42). Lt. Sandoval explained to Defendant that the interview was a follow-up on the criminal investigation. (Tr. 42). Lt. Sandoval testified that she instructed Defendant that he was not obligated to testify. (Tr. 42). Defendant indicated that he understood. (Tr. 42). Lt. Sandoval testified that Defendant indicated twice that he knew he could go back inside his residence to prepare a defense. (Tr. 44). Lt. Sandoval explained about three to four times that the interview pertained to a criminal investigation. (Tr. 44). Lt. Sandoval

testified that in no way did she threaten or induce Defendant to participate in the interview. (Tr. 44).

After the interview on October 17, 2014, Defendant contacted Lt. Sandoval's major, and requested to speak with Lt. Sandoval again. (Tr. 45). Lt. Sandoval met with Defendant next on October 21, 2014. (Tr. 46). By this time, Defendant's status in the investigation had changed. On the evening of October 17, 2014, Defendant had been suspended pending an internal investigation. (Tr. 45). Lt. Sandoval testified that she was not a part of the internal investigation. (Tr. 46).

On October 21, 2013, Lt. Sandoval contacted Defendant and let him know that she was available to meet. (Tr. 46). Their meeting took place in the interview room of the DeSoto County Sheriff's Office. (Tr. 46). The meeting was recorded on video. (Tr. 46). Because of the location, Lt. Sandoval wanted to make it very clear to Defendant that he did not have to be there and was free to go at any time. (Tr. 46). At no time did Defendant indicate that he wanted to terminate the interview. (Tr. 47). In no way did Lt. Sandoval induce or threaten Defendant to make the statement she did. (Tr. 47).

Lt. Sandoval testified that Defendant's employment was terminated on October 29, 2014 after an internal investigation took place. (Tr. 50). Lt. Sandoval did not play any part in the termination or investigation. (Tr. 50).

On cross examination, Lt. Sandoval testified as follows. She did not read Defendant *Miranda* rights during the June 26, 2013 or October 17, 2013 interviews. (Tr. 51). Lt. Sandoval testified that she did not suspect that Defendant was guilty of a crime during the October 17, 2013 interview, only that he had not been completely honest with her. (Tr. 52). Lt. Sandoval testified that it was her position that Defendant had lied by omission during the October 17, 2013

interview. (Tr. 52). Lt. Sandoval testified that she did not read Defendant *Miranda* rights because he was not in her custody. (Tr. 52).

Lt. Sandoval testified that she did not read Defendant *Miranda* rights at the October 21, 2013 meeting because he was not in her custody. (Tr. 55). Lt. Sandoval testified that she welcomed the meeting with Defendant when he reached out to her because she was hoping that he would tell the truth. (Tr. 55).

Lt. Sandoval testified that she is familiar with the Law Enforcement Officer's Bill of Rights. (Tr. 58). Lt. Sandoval did not review the Law Enforcement Officer Bill of Rights with Defendant or tell Defendant that he had a right to have a Police Benevolent Association ("PBA") representative or attorney represent him at the time of the interview because she wasn't conducting an internal affairs investigation. (Tr. 58-59).

Lt. Sandoval explained that an internal affairs investigation is an investigation conducted by the agency for a policy violation. (Tr. 59). Employees of DeSoto County have an affirmative obligation to cooperate in internal investigations. (Tr. 60). Lt. Sandoval testified that she did not explain the difference between an internal and criminal investigation throughout any of the interviews. (Tr. 60). Lt. Sandoval testified that Defendant stated that he had problems remembering things during his interviews. (Tr. 61). Lt. Sandoval testified that she never told Defendant that he had to speak to her because he worked for the DeSoto County Corrections Office, and Defendant never expressed a concern that he had to speak to Lt. Sandoval. (Tr. 65).

Lt. Sandoval testified that Agent Roncinske was not present when she first began the interview with Defendant on October 17, 2013. (Tr. 75). As a strategic decision, Lt. Sandoval suggested that Agent Roncinske show up after a few minutes because they believed that his

presence would inhibit Defendant from talking. (Tr. 75). Lt. Sandoval texted Agent Roncinske when she wanted him to come to the interview. (Tr. 75).

Lt. Sandoval testified that she and the Defendant had a working relationship. (Tr. 76). She testified that she knew he was in the U.S. military and encouraged him to become a sworn law enforcement officer. (Tr. 77). Lt. Sandoval testified that she liked Defendant in a professional way. (Tr. 77).

In response to a question posed by the Court, Lt. Sandoval testified that DeSoto County Sherriff's Office does not have a separate internal affairs division like larger agencies. (Tr. 80). Typically an administrative lieutenant or other officer gets assigned an internal affairs investigation. (Tr. 80). In an internal affairs investigation, a subject is notified immediately and they are interviewed at the DeSoto County Sheriff's Office while they are on duty. (Tr. 81).

On redirect, Lt. Sandoval testified that Defendant was advised at the police academy of their rights as corrections officers or law enforcement officers. (Tr. 82). Also, employees of DeSoto County Sheriff's Office are given a manual explaining internal affairs investigations and their rights. (Tr. 82). Employees are required to read the manual when they are first employed. (Tr. 82). Lt. Sandoval testified that during the October 17, 2013 and October 21, 2013 interview, Defendant indicated that he knew he was being recorded. (Tr. 82-83).

On recross, Lt. Sandoval testified that it appeared to her that Defendant kept trying to explain his actions in this case. (Tr. 85). Lt. Sandoval testified that Defendant never expressed that he thought he was part of an internal affairs investigation. (Tr. 87). Lt. Sandoval testified that Defendant appeared confused a couple of times during the interviews. (Tr. 87).

On redirect, Lt. Sandoval explained that Defendant would sometimes generate an answer to a question that had nothing to do with the question. (Tr. 87). Lt. Sandoval testified that it appeared Defendant was skating around the issue. (Tr. 88).

### C. Testimony of Agent James Roncinske

Agent Roncinske testified that he has been employed as a special agent by the FBI for approximately fourteen and a half years. (Tr. 89). Immediately prior to being employed by the FBI, he was employed by the city of Rochester, New York as a police officer for approximately nine and a quarter years. (Tr. 89). Prior to working for the Rochester police department, Agent Roncinske was employed by the Monroe County Sheriff's Office in Rochester, New York. (Tr. 89).

In June 2013, Agent Roncinske joined an investigation related to the allegation of the abuse of an inmate housed at the DeSoto County Jail on May 25, 2013. (Tr. 90). He joined the investigation around June 12, 2013. (Tr. 90). After becoming involved in the investigation Agent Roncinske was made aware of the interviews of Jody Holland, and of the interviews of the members of the DeSoto County Sheriff's Office. (Tr. 90-91). He also obtained the jail video from the day of the incident, obtained numerous telephone records, and went out and conducted interviews. (Tr. 91). Initially, he requested the phone records of Deputy Vincent Carlucci, Deputy Ashely Cross, and Corporal Steven Rizza. (Tr. 91). Agent Roncinske explained that he requested these officer's phone numbers because they were the ones involved during the alleged assault of Jody Holland. (Tr. 91).

By examining the cell phone records, Agent Roncinske found out that Corporal Rizza had a phone conversation on May 26, 2013 at approximately 7:42 p.m. that lasted about 41 minutes. (Tr. 92). Preceding that call there was a call between Corporal Rizza and Deputy Cross that had

lasted about 28 minutes. (Tr. 92). The date May 26, 2013 was significant because it was the day that Jody Holland was transported to the DeSoto Memorial Hospital for treatment, and it is when Mr. Holland initially made an accusation that he was assaulted by members of the DeSoto County Sheriff's Office. (Tr. 92).

Based on the phone records, Agent Roncinske formed an opinion that Corporal Rizza was telling information to Defendant about the incident. (Tr. 94). At the time he joined the investigation the status of Defendant was that of a witness or a person with potential knowledge. (Tr. 94). Agent Roncinske estimated that there were seven people with that status in the investigation. (Tr. 94).

On August 9, 2013, the day after Defendant testified before the grand jury, Defendant called Agent Roncinske and left a voice mail asking Agent Roncinske to call him back. (Tr. 97). During the phone call, Defendant expressed concern about his grand jury testimony, especially about questions posed to him involving his phone records. (Tr. 97).

On October 17, 2013, Agent Roncinske did not immediately go to interview Mr. Mause at the same time as Lt. Sandoval and Detective Wingate, because Lt. Sandoval thought that his initial presence may have inhibited Defendant from speaking freely. (Tr. 101). When he did arrive, Defendant's demeanor did not change. (Tr. 102). During the interview, Defendant stated that he knew he could go back inside his home and prepare a defense. (Tr. 110).

On October 22, 2013, Agent Roncinske went to Defendant's residence with a Charlotte County Sheriff's Deputy and served a target letter on Defendant. (Tr. 108). The target letter informed Defendant that he was a target of a grand jury investigation. (Tr. 108).

On cross examination, Agent Roncinske stated that he did not read Defendant *Miranda* rights before asking him questions on October 17, 2013. (Tr. 114). Agent Roncinske advised Defendant that he was free to go back inside his residence. (Tr. 115).

**III.     Analysis**

Defendant argues that his statements during the interviews should be suppressed because they were conducted without Defendant being advised of his Constitutional rights and because his statements were not made voluntarily. (Doc. 49 p. 6). Defendant argues that his rights under the Law Enforcement Officer's Bill of Rights were violated because his interviewers failed to inform him that he had a right to an attorney and to have a PBA union representative present during his questioning. (Doc. 49 p. 3). Additionally, Defendant argues that his statements were not voluntarily given because the manner in which the interviews were conducted were subtly coercive and deceptive. Defendant argues that he thought he had an obligation to speak with his interviewers because he was confused as to whether the investigating officers were conducting a criminal or internal affair investigation. Defendant argues that his responses to the questions posed by Agent Roncinske during the October 17, 2013 interview should be suppressed because Defendant was not under oath when responding to those questions.

The Government responds that Defendant was not in custody at any time during the interviews, and, therefore, he was not entitled to receive *Miranda* warnings. (Doc. 55 p. 14). Additionally, the Government argues that under the totality of the circumstances, it is clear that Defendant's statements were made voluntarily and free of coercion, threats, or promises. (Doc. 55 p. 15).

**A) Whether Defendant's statements should be suppressed because he was not informed of his constitutional rights.**

A defendant's statement while the defendant is in custody may only be introduced into

evidence if the defendant was given his *Miranda* rights prior to the interrogation. *United States v. Gomes*, 279 F. App'x 861, 868 (11th Cir. 2008). These rights include the right to remain silent; that statements can and will be used against them in a court of law, that the individual has a right to an attorney during questioning; and if that individual cannot afford an attorney, one will be appointed. *Miranda v. Arizona*, 384 U.S. 436, 178-479 (1966). However, before *Miranda* warnings are required, a defendant must be in custody and under interrogation. *Id*. (citing *United States v. Castro,* 723 F.2d 1527, 1530 (11th Cir. 1984) (per curiam)). A defendant who voluntarily gives a statement to law enforcement in a non-custodial situation need not be advised of his *Miranda* rights. *Missouri v. Seibert*, 542 U.S. 600, 608 (2004).

At the hearing, Defendant's counsel conceded that Defendant was not in custody at the time he made the statements he seeks to suppress. (Tr. 4). Thus, Defendant's interviewers had no duty to inform him of his *Miranda* rights. For this reason, the Court will not recommend that Defendant's statements be suppressed because his interviewers did not inform him of his constitutional rights.

As to Defendant's argument that his statements should be suppressed because he wasn't informed of his rights under the Law Enforcement Officer Bill of Rights, the Court finds this argument without merit. Defendant fails to cite to any authority holding that a violation of the Law Enforcement Officer Bill of Rights, which is codified in Fla. Stat. § 112.532 entails the suppression of a law enforcement officer's statements. On the contrary,

> several cases indicate that statutory violations by themselves are insufficient to justify the exclusion of any evidence obtained in that manner. *See United States v. Kington,* 801 F.2d 733, 737 (5th Cir.1986) (violation of statute will not result in suppression unless statute itself specifies exclusion as remedy), *cert. denied,* 481 U.S. 1014, 107 S.Ct. 1888, 95 L.Ed.2d 495 (1987); *United States v. Michaelian,* 803 F.2d 1042, 1049 (9th Cir.1986) (violation of 26 U.S.C. § 6103 does not require suppression); *United States v. Frazin,* 780 F.2d 1461, 1465–66 (9th Cir.) (violation of Right to Financial Privacy Act does not warrant exclusion), *cert. denied,* 479

> U.S. 839, 107 S.Ct. 142, 93 L.Ed.2d 84 (1986); *cf. Pennsylvania Steel Foundry & Mach. v. Secretary of Labor,* 831 F.2d 1211, 1219 (3rd Cir.1987) (noting that some courts have determined that exclusionary rule is not appropriate for statutory violations); *United States v. Comstock,* 805 F.2d 1194, 1207–08 (5th Cir.1986) (holding that non-compliance with Rule 41 does not warrant exclusion and citing language from numerous opinions stating that only *constitutional* violations justify suppression), *cert. denied,* 481 U.S. 1022, 107 S.Ct. 1908, 95 L.Ed.2d 513 (1987). *Cf. United States v. Sainsbury–Suarez,* 797 F.2d 931, 933 (11th Cir.1986) (violations of international law do not require exclusion).

*United States v. Thompson*, 936 F.2d 1249, 1251 (11th Cir. 1991). Therefore, even assuming that Defendant's rights under the Law Enforcement Officer Bill of Rights were violated, there would still be no grounds for suppression, as Fla. Stat. § 112.532 does specify exclusion of evidence as a remedy for the statute's violation.

### B) Whether Defendant's statements should be suppressed because they were not made voluntarily

In order for a suspect's statement to law enforcement officers to be voluntary it must be "the product of an essentially free and unconstrained choice. *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1991). "In determining whether a defendant's will was overborne in a particular case, the Court has assessed the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." *Id.* at 226. Some factors that are taken into account include the suspect's education or low intelligence, the lack of any advice to the suspect of his constitutional rights, the length of detention, the repeated and prolonged punishment such as the deprivation of food or sleep. *Id.* As the Eleventh Circuit noted in *United States v. Mendoza-Cecilia*:

> The focus of the voluntariness inquiry is on whether the defendant was coerced by the government into making the statement: "The relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception." *Colorado v. Connelly,* 479 U.S. 157, 170, 107 S.Ct. 515, 523, 93 L.Ed.2d 473 (1986) (citation omitted). The district court must consider the totality of the circumstances in assessing whether police conduct was "causally related" to the confession. *Miller,* 838 F.2d at 1536.

> Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession. *See Colorado,* 479 U.S. at 163 n. 1, 107 S.Ct. at 520 n. 1; *Miller,* 838 F.2d at 1536; *United States v. Castaneda–Castaneda,* 729 F.2d 1360, 1362–63 (11th Cir.1984). Isolated incidents of police deception, *see Castaneda–Castaneda* 729 F.2d at 1362–63; *Frazier v. Cupp,* 394 U.S. 731, 739, 89 S.Ct. 1420, 1424–25, 22 L.Ed.2d 684 (1969), and discussions of realistic penalties for cooperative and non-cooperative defendants, *see United States v. Nash,* 910 F.2d 749, 753 (11th Cir.1990), are normally insufficient to preclude free choice.

963 F.2d 1467, 1475 (11th Cir. 1992).

In this case, there is no evidence before the Court that Defendant's statements were the result of coercion or deception. To the contrary, the evidence shows that under the totality of the circumstances, Defendant's statements were the product of his free and deliberate choice, and, thus, were voluntarily made. As to the June 6, 2013 interview, the evidence presented at the hearing shows that Defendant was instructed by Lt. Sandoval at the outset of the interview that she was conducting a criminal investigation into the allegations of an inmate at DeSoto County Jail that he had been battered by a correctional officer while he was in jail. (Gov. Ex. 2 p. 1). The interview occurred outside the front entry of Defendant's residence, located within an apartment complex[2]. During the course of the interview, at least one member of the public passed by the interview, which was being held in a commons area of the apartment complex. The entirety of the interview lasted approximately ten minutes and Defendant was able to return inside his home immediately after questioning. The Court has reviewed the recording of the June 6, 2013, interview and its transcript and finds that there is no suggestion of coercion or deception during this encounter.

---

[2] Defendant argues in his Reply to the Governments Response to the Supplement that the interviews actually occurred inside Defendant's residence based on an after action report. (Doc. 92 p. 2). The testimony of Det. Snow, Lt. Sandoval, and Agent Roncinscke all placed the interviews on June 6, 2013 and October 17, 2013 outside Defendant's residence. The transcripts and audio recordings of these interviews suggest they were outside. In any event, even if the interviews occurred inside Defendant's home, this fact alone does not change the Court's analysis.

The Court has reviewed the entirety of the transcript of Defendant's testimony before the grand jury on August 8, 2013.  Again, there is nothing to suggest that Defendant's statements were the product of deception or coercion on the part of the Government.  At the time, Defendant was considered a witness and testified without being threatened or promised anything in exchange for answering questions.  The nature of the proceedings made it obvious that his testimony related to a criminal investigation and not a DeSoto County internal affairs investigation.

Likewise, there is no evidence that Defendant's statements during the October 17, 2013 interview were the result of coercion or deception.  In fact, statements made by Lt. Sandoval, Agent Roncinske, and Defendant demonstrate the opposite, i.e., that Defendant was informed of his right to cut off the interview at any time, and that he understood this right.  For example, near the beginning of the interview, Lt. Sandoval specifically said to Defendant, "You are not compelled to talk to me.  You don't have to talk to me.  We told you last time, you can walk back inside, tell me to go, and I'll go." (Gov. Ex. 7 p. 5).  Again, after Agent Roncinske arrived at the interview approximately ten minutes after the interview began, Lt. Sandoval stated, in reference to Defendant, "I reminded [Defendant] that I'm doing a criminal not an internal, and he doesn't have to talk to me, and he is agreeing to talk to me and cooperate." (Gov. Ex. 7 p. 19).  Further into the interview, when Defendant was confronted with evidence that he was on the phone with Corporal Rizza when he altered the incident report, Defendant stated that "No, I get that, that's why I'm standing here today, telling you about it from what I know.  I could just as easy go in there and try to prepare my defense, and try to make up stuff." (Gov. Ex. 7 p. 30).  In response, Agent Roncinske stated "You are free to do that." (Gov. Ex. 7 p. 30).  A few moments later, Defendant stated that "I understand I can go back in, prepare a defense and all that.  I'm not

saying that in a threatening manner, by any means, but you know exactly where I'm going with it." (Gov. Ex. 7 p. 30). The Court will not suppress any statements made during this interview.

Finally, the Court finds that Defendant's statements during the October 21, 2013 interview were voluntarily given. The absence of coercion is evident from the exchange that occurred between Lt. Sandoval ("KS") and Defendant ("JM") at the beginning of the interview:

> KS: All right. It's 11:55 [a.m.] on the 21st of October, 2013. This is a little different because it's here at the sheriff's office now, but I want to repeat, you know, what we said at the house the other day, this is a criminal investigation. This is not an internal investigation. It will probably go that route, but that's not my job. My job is to conduct the criminal investigation into this matter.
>
> JM: Yes, ma'am.
>
> KS: You don't have to talk to me. You can get up and walk out of the door any time you feel like it; it's not locked. Okay. You're familiar with this facility obviously, okay?
>
> JM: Yes, ma'am.
>
> KS: That has to be said, all right, because it is a criminal investigation. I'm not reading you your rights or anything because you're not in custody.
>
> JM: I understand.

(Gov. Ex. 9 p. 2-3). Even more probative is Defendant's statement that, "Again, I've come to you with any and all information. Yes, this is voluntary." (Gov. Ex. 9 p. 5).

Additionally, the Court finds no basis to suppress evidence on the grounds that Defendant did not understand the difference between the criminal and internal investigation, and mistakenly believed that he was required to provide testimony to Lt. Sandoval and Agent Roncinske's questioning. As provided above, Defendant remarked multiple times during his interviews that he understood that he did not have to speak with his questioners and that he could cease doing so at any time. (Gov. Ex. 7 p. 30; Gov. Ex. 9 p. 2-3, 5). Defendant was instructed during each of the interviews that they pertained to a criminal investigation. (Gov. Ex. 2 p. 1; Gov. Ex. 7 p. 5;

Gov. Ex. 9 p. 2-3). On multiple occasions Defendant's interviewers specifically told him that the questioning was not in reference to an internal investigation. (Gov. Ex. 7 p. 5; Gov. Ex. 9 p. 2-3). Furthermore, Defendant failed to introduce any evidence showing that he actually believed that he was obligated to speak to his interviewers.

As to Defendant's argument at the hearing that his statements in response to questions posed by Agent Roncinske should be suppressed because he was not under oath as to these questions, the Court rejects this argument as meritless. Defendant failed to provide any legal support for such an argument in its original motion, at the hearing, in the supplemental brief filed in support of the motion to suppress, or in the reply to the Government's response to the supplemental brief.

Finally, in his Supplement to the Motion to Suppress Statements, Defendant argues for the first time that his statements during the interview should be suppressed because Defendant does not satisfy the "willfull" element of 18 U.S.C. § 1001. As the Government correctly notes, such a contention by Defendant is misplaced in a motion to suppress. In any event, this statutory argument is redundant as Defendant is essentially arguing that his statements were not "willfull" because he was tricked and coerced into giving his interviews. As explained at length above, the Court finds no evidence of trickery or coercion causing Defendant to make his statements.

For the reasons explained above,

**IT IS RESPECTFULLY RECOMMENDED THAT:**

Defendant's Motion to Suppress Statements (Doc. 49) be **DENIED**.

**Respectfully recommended** in Chambers in Fort Myers, Florida on July 15, 2014.

_____
DOUGLAS N. FRAZIER
UNITED STATES MAGISTRATE JUDGE

### NOTICE TO PARTIES

Failure to file and serve written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date it is served on the parties shall bar an aggrieved party from a de novo determination by the District Court of issues covered in the report, and shall bar the party from attacking on appeal factual findings in the report accepted or adopted on appeal by the District Court except upon grounds of plain error or manifest injustice. 28 U.S.C. § 636(b)(1)(C); Local Rule 6.02

Copies furnished to:

Counsel of Record
Unrepresented Parties